UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PRISCILLA D. SIMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:15-cv-00147-SGC |
| | ) |
| FRANK NORTON, LLC, *d/b/a Milo's Hamburgers*, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**[1]

This matter is before the court on the motions for summary judgment filed by Defendants, Frank Norton, LLC, d/b/a Milo's Hamburgers ("Milo's"), and Kenneth Nelson ("Nelson"). (Docs. 23, 26). In her amended verified complaint, Plaintiff asserts four claims against Milo's: race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count One); disparate treatment on the basis of race in violation of 42 U.S.C. § 1981 (Count Two); creation of a "hostile work environment" based on sexual harassment in violation of Title VII (Count Three); and negligent hiring, training, supervision, or retention (Count Four). (Doc. 4).[2] Plaintiff asserts four additional claims against Nelson: assault (Count Five); battery (Count Six); invasion of privacy (Count Seven); and outrage (Count Eight). (*Id.*). The motions are fully briefed and ripe for adjudication. (Docs. 29, 30, 33, 34). For the reasons discussed below, the motions are due to be granted in part and denied in part.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 16).

[2] As noted below, Plaintiff has since abandoned her race discrimination claims.

I.      **BACKGROUND AND RELEVANT FACTS**

Plaintiff is a white female who began working for Milo's on June 8, 2008.  (Doc. 23 at 2). She was assigned to the restaurant chain's Gardendale location.  (*Id.*).  In September 2010, Plaintiff took maternity leave.  (*Id.*).  Prior to taking maternity leave, Plaintiff was subjected to numerous inappropriate sexual comments from a manager named Ryland.  (*Id.* at 7).  Plaintiff reported these comments to Louise McDaniel, Milo's human resources manager at the time, and McDaniel investigated.  (*Id*. at 8).  Plaintiff states nothing happened after she reported Ryland except that she was "shamed" and "talked about," and she drew the conclusion that following Milo's reporting policy would not do any good.  (Docs. 29 at 13; 24-1 at 82).  After her maternity leave, Plaintiff returned to work at the Gardendale location in August 2011, and was awarded a raise of $1.00 per hour.  (Doc. 23 at 2).

On August 20, 2011, Plaintiff completed a "sign-off" sheet, which included the following language:

> I have read and understand Milo's Hamburgers policy on the prevention of Sexual Harassment…. I understand Milo's Hamburgers prohibits any form of harassment of our employees, whether such harassment is lawful or unlawful.  It is never justifiable to harass one of our employees because of the employee's race, color, sex, sexual orientation, weight, religion, national origin, age, disability or any other reason.  As a condition of my employment by Milo's Hamburgers, I agree to adhere to the Policy.
>
> I hereby acknowledge receipt of 'WHAT EVERY MILO'S EMPLOYEE SHOULD KNOW.'  All pages of this policy have been reviewed by me.  I understand and agree to abide by these rules and guidelines during my employment with Milo's.

(*Id.*; *see also* Doc. 24-3 at 2).  The parties disagree about what constitutes Milo's harassment policy.  Milo's contends it refers to a statement that was posted in the Gardendale location and gives specific instructions for reporting sexual harassment, including the following:

2

>The Company will not tolerate you being harassed. You must not tolerate it either. If you believe that you are being harassed, immediately report the matter to Louise McDaniel, Director of Human Resources, at (205) 965-0208. If you should feel uncomfortable reporting the problem to Louise McDaniel, then report it to Tom Dekle (205-410-5131). The management in the General Office will fairly and promptly investigate every sexual harassment complaint. Proven offenses will result in disciplinary action up to and including dismissal, and may lead to personal, legal, and financial liability.

(Doc. 23 at 3; *see also* Doc. 24-4).

The document titled "WHAT EVERY MILO'S EMPLOYEE SHOULD KNOW" restates the general prohibition against harassment. The first page of this document states, "You may confront the harasser if you feel comfortable doing so, or report the harassment to your manager or an appropriate human resource manager." (Doc. 31-6 at 1). Page two recommends reporting harassment to "the human resource manager, your department head, or a supervisor." (*Id.* at 2). Page three instructs the employee to "promptly contact your immediate supervisor, your supervisor's supervisor, the human resource manager, or any appropriate corporate officer or company representative." (*Id.* at 3).

Plaintiff alleges the harassment policy consists of other documents as well, which do not contain the same instructions for reporting harassment. (Doc. 29 at 3; *see also* Doc. 31-6). For example, a document titled "The Sexual Harassment Policy" states:

>Sexual harassment will not be tolerated and will result in disciplinary action, including possible termination. If you feel that you are being subjected to sexual harassment, promptly contact your immediate supervisor, your supervisor's supervisor, the human resource manager, or any appropriate corporate officer or company representative.

(Doc. 31-6 at 4).

In September 2012, Nelson was transferred to the Gardendale location to work as an assistant general manager. (Doc. 23 at 8). Plaintiff alleges Nelson began harassing her almost immediately, subjecting her to inappropriate sexual comments as well as physical contact. (*Id.* at

3

8-9). Plaintiff states that prior to May 7, 2013, she informed Milo's corporate employee Rob Litton that there was "some stuff going on" at the Gardendale store and she didn't want to go to work, but there was no follow-up from Milo's. (Doc. 29 at 4; *see also* Doc. 24-1 at 81). Though she did not say so to Litton, Plaintiff testified this conversation related to her problems with Nelson. (Doc. 24-1 at 81). Milo's contends it was not aware of Nelson's conduct until Plaintiff, through her attorney, reported it on May 7, 2013. (Doc. 23 at 9). It is undisputed Plaintiff herself did not report Nelson's conduct to either Louis McDaniel or Tom Dekle until that date.

Milo's contends Plaintiff never told Nelson to stop his behavior and did not tell him that it made her uncomfortable. (Doc. 23 at 10). However, Plaintiff has offered testimony disputing this contention. Plaintiff's coworker, Christina Armstrong, testified to having overheard Plaintiff telling Nelson that his behavior was unwanted. Specifically, she testified that Plaintiff told Nelson on five or six occasions his conduct was unwanted, stating, "you need to stop, this isn't right, I don't appreciate it." (Doc. 24-18 at 11, 24). Also, when Nelson would go out of his way to inappropriately touch Plaintiff, Plaintiff would "would always further herself from him and walk away." (*Id*. at 11). According to Armstrong, Nelson harassed her as well. (*Id.* at 4). Armstrong told Plaintiff she reported Nelson's harassment but "was pretty much blown off," except "there was a new piece of paper on the bulletin board" the next day. (*Id.*).[3] Armstrong's

---

[3] Plaintiff also submitted an affidavit in which Milo's employee Heather Young states she reported Nelson's conduct towards Plaintiff to two corporate representatives and gave them "a number of examples" of incidents when she "had seen Ken sexually harassing Priscilla." (Doc. 31-2). The corporate representative who took Young's complaint "tried to make it seem like [Young] said everything that happened between [Nelson] and [Plaintiff] was all innocent" by changing the wording to "make it seem like the work area was too small" so touching was inevitable. (*Id.* at ¶¶ 33-38). Young wrote on the back of the typed statement that it was an inaccurate account of what she wanted to report and then signed it. (*Id.*).

Nothing in the record makes it clear when exactly Young made the report which she alleges was mischaracterized and ultimately ignored. Therefore, the court will consider Young's

hours were cut when she reported Nelson's harassment, and she told Plaintiff that Milo's did "[n]ot an F'ing thing about it." (Doc. 29 at 6).

Plaintiff's counsel sent a demand letter to Milo's on May 7, 2013, informing Milo's of Nelson's conduct. (Doc. 24-13). Regarding the time between when the harassment started and Plaintiff reported it, Plaintiff stated she did not feel comfortable going to Louise McDaniel about Nelson's conduct given the way McDaniel handled Plaintiff's reports about Ryland's harassment in 2010. (*Id.*). Plaintiff also stated her attorney influenced the timing, in that he was "going to handle everything, so [she] didn't have to do it," and she "didn't have any control" over when he reported the harassment to Milo's. (*Id.*; Doc. 24-1 at 41-42). She stated she did not confront Nelson directly about his harassment because she was scared. (Doc. 24-1 at 42). Instead, Plaintiff made recordings of her conversations with Nelson between February 9, 2013, and March 30, 2013. (Doc. 28-1 at 36). When asked when she expected to stop making her daily recordings, Plaintiff stated she would stop "[w]hen it was over," meaning when she was out of "the danger zone of somebody believing me, that it really happened." (Doc. 24-1 at 41).

Nelson, in his motion for summary judgment and evidentiary filings, contends he and Plaintiff had a friendly relationship. (Doc. 27 at 2). As a general matter, Plaintiff disputes this. (Doc. 30 at 3). Nelson points to their text message and Facebook message exchanges. (Docs. 28-3, 28-4). Regarding Facebook, Plaintiff contends she was connected with Nelson on that platform for a brief time, but shortly thereafter she blocked his account because he sent her pornography. (Doc. 28-1 at 22-23). As for their text messages, Plaintiff and Nelson did communicate via text at least intermittently during January and February 2013, and the messages

---

affidavit to the extent it provides direct evidence of Nelson's misconduct toward Plaintiff, but the court will not consider Young's testimony as evidence of Milo's knowledge of Nelson's misconduct or failure to address it prior to May 7, 2013.

indicate Plaintiff and Nelson also spoke over the phone. (Doc. 28-4). These exchanges are brief, and the majority of them are work-related. The messages are neither unfriendly nor overly familiar. (*Id.*).

On June 27, 2013, Louise McDaniel prepared a termination report for Nelson based upon his conduct. (Doc. 31-5). The report indicates Nelson misled management in an investigation and violated company policy by making inappropriate sexual comments to Plaintiff in the workplace. (*Id.* at 3). The report notes Nelson initially denied ever making any inappropriate sexual remarks. (*Id.*). However, Plaintiff's audio recordings are quoted in the report as containing at least the following statements:

- "You walking and smoking is sexy as hell – that's just sexy."
- "I'm all for getting that ass fat. I'm working with you not against you on that."
- In response to Plaintiff's comment that she was tired and was up late, Nelson suggested she "[got] that ass knocked out last night."
- In response to Plaintiff's comment that she needed to concentrate, Nelson made a comment about her getting "that ass beat down."

(*Id.*). When confronted with the report, Nelson was given an option to resign or be terminated. He chose to resign. (Doc. 30 at 15-16).

Nelson denies touching Plaintiff except by giving her "fist bumps" as a greeting. (Doc. 28-2 at 13-14). Nevertheless, Nelson conceded at deposition his comments were violative of Milo's harassment policy. (Doc. 24-11 at 16). Nelson stated the comments in question were just "everyday conversation." (*Id.* at 17). Nelson indicated he believed sexual harassment would cover a situation in which he asked Plaintiff to meet him somewhere for sex but did not consider their exchanges to be harassing because "both of us [were just] engaging in conversation." (*Id.*). Similarly, Nelson characterized his comments as joking in nature but conceded that even jokes could be unintentional harassment under Milo's policy. (*Id.* at 7). Nelson stated he "was in the

6

wrong … by making comments" and "was wrong by doing that" but also stated that "at the time [he] didn't see that as being sexual harassment." (*Id.* at 10).

Plaintiff has submitted evidence of additional comments from Nelson which were not captured on the recordings. For example, Young states Plaintiff once made the comment that she "sucks" at being a meat cook, to which Nelson replied, "That's not the only thing you suck on." (Doc. 31-2 at ¶ 15). On another occasion, Plaintiff asked Nelson to fill a sauce bottle for her. Nelson put the bottle in front of his crotch and said, "I'll fill it up for you." (*Id.* at ¶ 13). Plaintiff recounts several additional and similarly vulgar statements in her amended verified complaint. (Doc. 4 at ¶¶ 38-40, 45-46).

After Plaintiff's counsel sent a demand letter on May 7, 2013, Milo's immediately transferred Nelson to another store. (Doc. 23 at 10). In addition to transferring Nelson, Milo's initiated an investigation, during which Plaintiff revealed she had been recording conversations at the workplace. (*Id.*). After obtaining copies of the recordings, Milo's met with Nelson, and he resigned. (*Id.* at 11).

On October 16, 2013, Plaintiff filed an EEOC charge alleging race discrimination and sexual harassment. (Doc. 1 at 21-23). Plaintiff was issued a right to sue letter by the EEOC on October 28, 2014. (*Id.* at 25). Plaintiff filed the instant case on January 26, 2015. (Doc. 1).

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).

The burden of proof is on the moving party to show the absence of any genuine issue of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge;" instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, unless Plaintiff is able to show some evidence with respect to each element of her claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).

**III.   DISCUSSION**

    **A.  Counts One And Two – Race Discrimination**

Plaintiff concedes Counts One and Two of her complaint are no longer supported by the facts revealed in discovery. (Doc. 29 at 17). She has voluntarily abandoned these counts and agrees to their dismissal or, in the alternative, to entry of judgment in favor of Milo's. Accordingly, judgment will be entered in favor of Milo's as to Counts One and Two.

    **B.  Count Three - Hostile Work Environment**

In Count Three, Plaintiff asserts a claim against Milo's for gender discrimination in violation of Title VII. (Doc. 4 at 12-14). This is a vicarious liability claim in that Plaintiff alleges Milo's created a hostile work environment by failing to properly hire, train, supervise, or discipline Nelson in response to reports of his sexually inappropriate behavior. An employer may be vicariously liable under Title VII to a victimized employee even when the plaintiff was not subjected to "tangible" adverse employment action, such as demotion or termination, that

would normally count as a change in her "terms and conditions" of employment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

This claim is subject to an affirmative defense that looks to the reasonableness of the employer's conduct in seeking to prevent and correct harassing conduct and to the reasonableness of the employee's conduct in seeking to avoid harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). Under the *Ellerth/Faragher* defense, an employer can avoid liability by showing it exercised reasonable care and the plaintiff failed to take advantage of corrective or preventative opportunities. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296-97 (11th Cir. 2000). Both prongs must be satisfied for the employer to avoid liability, and the employer bears the burden of proof. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001).

1. Exercise of reasonable care by Milo's

An employer can meet its burden of demonstrating it took reasonable care to prevent harassment by promulgating an anti-harassment policy, but it must also show the policy is not otherwise "defective or dysfunctional." *Madray,* 208 F.3d at 1299. The employer must show its policy was effectively published, contained reasonable complaint procedures, and contained no other fatal defect. *Speigner v. Shoal Creek Drummond Mine*, 402 Fed. App'x 428, 431 (11th Cir. 2010).

There is conflicting evidence as to what constituted Milo's harassment policy. (Doc. 29 at 3). The employee "sign-off" sheet states a general prohibition against harassing conduct and, by signing it, the employee acknowledges receipt of the "policy" titled "WHAT EVERY MILO'S EMPLOYEE SHOULD KNOW." (Doc. 24-3). By executing the sign-off sheet, the employee agrees to "abide by these rules and guidelines" − i.e., those contained in the policy document. (*Id.*). The document titled "WHAT EVERY MILO'S EMPLOYEE SHOULD

KNOW" restates the general prohibition against harassment. The first page of this document states, "You may confront the harasser if you feel comfortable doing so, or report the harassment to your manager or an appropriate human resource manager." (Doc. 31-6 at 1). Page two recommends reporting harassment to "the human resource manager, your department head, or a supervisor." (*Id.* at 2). Page three instructs the employee to "promptly contact your immediate supervisor, your supervisor's supervisor, the human resource manager, or any appropriate corporate officer or company representative." (*Id.* at 3).

Another document, titled "CORPORATE SEXUAL HARASSMENT POLICY," gives several examples of conduct the company considers to be violations of company policy. (Doc. 24-4). This document also gives explicit instructions that an employee must "immediately report" harassment to Louise McDaniel in her capacity as Director of Human Resources or alternatively to Tom Dekle. (*Id.*). Milo's states this policy was posted at Plaintiff's workplace "around the time" Plaintiff claims to have been harassed by Mr. Nelson. (Doc. 23 at 24).

Each of these formulations satisfies the first prong of the *Ellerth/Faragher* defense because they were effectively published, contained reasonable complaint procedures, and contained no other fatal defect. *Speigner,* 402 Fed. App'x at 431. Plaintiff was aware of each policy (she signed an acknowledgement of receipt as to one, and the other appears to have been posted at her workplace), and each provides an "alternative avenue for lodging a complaint other than a harassing supervisor." *Madray,* 208 F.3d at 1298.

Although a facially adequate policy may be insufficient where it is shown to be "dysfunctional," such a finding appears to be reserved to cases in which an employee lodged an official complaint in keeping with the company's policy, but it was nevertheless ignored or otherwise mishandled. *See, e.g., Mack v. ST Aerospace Eng'g, Inc.*, 195 Fed. App'x 829, 839 (11th Cir. 2006). Here, Plaintiff acknowledges she did not "immediately" make any official

complaint about Nelson's misconduct. To the contrary, although she states understandable reasons for the delay, Plaintiff waited to officially complain about his misconduct until eight months after it started.[4] Accordingly, the court finds Milo's promulgated a policy which meets the requirement for the first prong of the *Ellerth/Faragher* affirmative defense.

    2. <u>Plaintiff's availment of corrective/preventative opportunities</u>

Milo's contends Plaintiff acted unreasonably by failing to take advantage of the harassment policy and argues it should not be held accountable for conduct of which it was not aware. (Doc. 23 at 27) (citing *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1306-07 (11th Cir. 2007)). However, an employee's obligation to "take full advantage" of an employer's preventative measures is not absolute. *Frederick*, 246 F.3d at 1314. The standard announced by the Supreme Court is whether the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Id.* (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).

Milo's asserts Plaintiff acted unreasonably because she failed to make use of any corrective or preventative opportunities with regard to Nelson's conduct. (Doc. 23 at 26-29). First, Milo's points to Plaintiff's failure to report her harassment until eight months after the harassment began, thereby failing to adhere to the policy which requires victims to "immediately" report misconduct. (*Id.* at 26). Further, Milo's contends Plaintiff did nothing to "otherwise avoid harm." (*Id.*).

---

[4] Plaintiff has presented evidence she contacted Milo's employee Rob Litton and told him there were "problems at the Gardendale store." (Doc. 24-1 at 20). Plaintiff contends that when she made this disclosure, she was referring to Nelson's misconduct. (*Id.*). However, Plaintiff has not submitted any evidence which would explain why, if she intended to communicate with Litton about her harassment when she contacted him, she could not have done so. Accordingly, the court does not view this evidence as establishing that Milo's harassment policy was inadequate to permit Plaintiff to make her complaint in some way other than by reporting it to Nelson himself.

Plaintiff contends she acted reasonably because she attempted to report Nelson's misconduct to a corporate representative and, in any event, had good reason for not reporting Nelson immediately. (Doc. 29 at 20-22). Plaintiff has presented evidence she perceived Milo's to be unresponsive and/or insensitive to sexual harassment complaints. When Plaintiff complained about being harassed by Ryland, Milo's "did nothing," and the only consequence was she was "shamed, talked about." (Doc. 24-1 at 82). Later, when Christina Armstrong reported harassment, her hours were cut, and she told Plaintiff that Milo's did "[n]ot an F'ing thing" about it. (Doc. 29 at 6). With regard to the delay in reporting, Plaintiff contends she waited because she wanted to be out of the "danger zone" of having to worry people would not believe her. (Doc. 24-1 at 41).

Plaintiff has submitted evidence which, if true, shows Plaintiff had good reason to be suspicious of Milo's management and the reporting procedure outlined in the harassment policy. Further, Plaintiff took other steps to avoid harm by informing Nelson his conduct was unwelcome, documenting the harassment, and seeking the advice of counsel. Given this evidence, Milo's is unable to defeat the second prong of the *Ellerth/Faragher* defense. Because it must establish both prongs to succeed in avoiding liability, Milo's cannot prevail at the summary judgment phase as to Plaintiff's hostile work environment claim. Accordingly, Milo's motion for summary judgment is due to be denied as to Count Three.

### C. Count Four – Negligence

Alabama recognizes a common law cause of action for negligent and/or reckless hiring, supervision, or retention. *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993) (*abrogated on other grounds*). Where an employer responds immediately and aggressively to a report of harassment, it likely avoids liability for the misconduct of its employee. However, where an employer fails to supervise, train, or otherwise take corrective action in the face of a history of

bad behavior, it can be held vicariously liable for the misconduct of the offending employee. *Stancombe*, 652 Fed. App'x 729, 739 (11th Cir. 2016). To succeed, Plaintiff must prove Milo's knew or should have known of Nelson's incompetence. *Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1216 (Ala. 2008). The employee's misconduct must be "habitual, rather than occasional, or of such a character as to render it imprudent to retain him in service." *Stancombe* 652 Fed. App'x at 739 (quoting *First Nat'l Bank of Montgomery v. Chandler*, 39 So. 822, 828 (Ala. 1905)).

Milo's contends it is entitled to summary judgment because Nelson worked alongside Simmons for five years "without issue," Nelson was trained on the sexual harassment policy, and Milo's forced Nelson to resign when Plaintiff's recordings were revealed. (Doc. 23 at 30). Plaintiff responds that Milo's took no action when other employees complained Nelson harassed them, Milo's retaliated against employees for reporting Nelson's harassment, and Milo's failed to maintain a consistent policy on harassment or to follow the policies it had. (*Id.*). By presenting evidence to support these assertions, Plaintiff has created a factual issue as to whether Milo's was negligent in its supervision, training, and retention of Nelson.[5]

The parties dispute whether Milo's had a coherent policy on sexual harassment and followed it consistently. Dekle testified that a "fair, discreet investigation" of a sexual harassment claim, as that phrase is used in the Milo's policy, consists of management speaking with the accuser and accusee after separating the two by assigning them to different stores. (Doc. 24-2 at 5). Dekle further stated:

---

[5] As explained above, in the context of the *Ellerth/Faragher* analysis of a hostile work environment claim, Milo's has shown it had a reasonable harassment policy in that it published instructions which permitted an employee to report harassment to someone other than a harassing supervisor. As discussed below, the reasonableness standard for an employer in the context of a negligence claim is more demanding because it looks to whether the employer "knew or should have known" of a supervisor's incompetence. *Southland Bank,* 21 So. 3d at 1216.

13

> If [the complaint] was deemed to have merit then we would take appropriate action. We would separate the two so they would not have to work together. And if it was deemed to be a policy violation of a clear, intentional matter then they would be terminated.
> …
> If it was something that – either language or some kind of inappropriate innuendo then we would separate them and then continue the investigation and then take the appropriate action from there.
> …
> So if the person felt like they were being harassed for any reason we just didn't take a chance and we would allocate them to another store.

(*Id.*). Dekle acknowledged it would be a violation of Milo's policy if an employee reported harassment but no follow-up investigation was conducted. (*Id.* at 16).

Plaintiff has submitted evidence that Nelson harassed Christina Armstrong repeatedly before harassing Plaintiff but Milo's did not act according to its stated policies. (Doc. 29 at 12; Doc. 31-1 at 5-7). Armstrong reported Nelson's conduct to her crew manager. (Doc. 31-1 at 5). The crew manager told Armstrong she was overreacting, and Armstrong's hours were cut. (*Id.* at 5-6). A district manager came to the store later and interviewed Armstrong at length about Nelson's behavior but told Armstrong early on in the interview she was "overreacting and emotional." (*Id.* at 6). Armstrong submitted her two-week notice and resigned shortly thereafter. (*Id.*). According to Armstrong, no further action was taken regarding her reports of Nelson's conduct. (*Id.*). Nelson himself referred to the fact that Armstrong reported him for misconduct stating, "Can you believe Christina tried to say that I sexually harassed her? If I went after anyone, it would have been you." (Doc. 4 at ¶ 37).

When Armstrong quit, she told McDaniel and Dekle (to whom victims of misconduct were instructed to report) that she was leaving due to "actions taken by management." (Doc. 24-18 at 33). Neither Dekle nor McDaniel was aware Armstrong had made a complaint of being harassed nor did they follow up with any inquiry about Nelson's conduct or Armstrong's dissatisfaction with Milo's response. (*Id.*).

14

Plaintiff has created a factual issue as to whether Milo's was aware of Nelson's incompetence or reasonably should have been. *Armstrong*, 817 So. 2d at 683. She has presented evidence that Milo's knew of Nelson's prior misconduct by way of Armstrong's reports. Plaintiff has further presented evidence Milo's failed to act when Plaintiff reported that she was harassed by Ryland. To the extent Milo's had an articulable policy for evaluating and acting upon reports of harassment, Plaintiff has presented evidence from which a jury could conclude Milo's failed to follow the policy. Viewed in the light most favorable to the nonmovant, this evidence is sufficient to create a genuine dispute as to whether Milo's was negligent in its supervision, training, and retention of its managers, specifically with regard to Nelson. Accordingly, Milo's motion for summary judgment is due to be denied as to Count Four.

**D. State Law Claims Against Kenneth Nelson**

1. <u>Assault and Battery – Counts Five and Six</u>

Plaintiff asserts a claim for assault in Count Five and battery in Count Six. (Doc. 4 at 14-15). Under Alabama law, assault is "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Hester v. Brown*, 512 F. Supp. 2d 1228, 1235 (N.D. Ala. May 25, 2007) (internal citations omitted). A "successful" assault becomes a battery. *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995). Battery consists of the touching of another in rudeness, in anger, or in a hostile manner. *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (11th Cir. 1986). Assault and battery are frequently analyzed together because they involve overlapping elements and facts, and the court does so here.

In order to succeed on her claims for assault and battery, Plaintiff must establish that (1) Nelson touched her; (2) Nelson intended to touch her; and (3) the touching was conducted in a

harmful or offensive manner. *Simmons v. Mobile Infirmary Med. Ctr.*, 391 F. Supp. 2d 1124, 1130 (S.D. Ala. 2005). Where the evidence of whether a battery occurred is conflicting, the question is for the jury. *Surrency*, 489 So. 2d at 1104. Where a plaintiff submits evidence that a touching was unwelcome and was "conducted with sexual overtones," such factual assertions constitute substantial evidence of a battery. *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998).

Nelson contends Plaintiff's assault and battery claims must fail because she does not offer any evidence that Nelson's conduct was harmful or offensive at the time it occurred. (Doc. 26 at 2) (citing *Simmons*, 391 F. Supp. 2d at 1130). Plaintiff has presented evidence Nelson touched her in an offensive manner – *i.e.*, with unwanted sexual overtones. (*See, e.g.*, Doc. 28-1 at 24 ("It was every single day, every day, nasty, touching, 24/7 while I was at work, every day.")). Further, Plaintiff has presented evidence that she notified Nelson his physical contact with her was unwelcome. (*See, e.g.*, Doc. 24-18 at 11 (Armstrong testimony that Plaintiff told Nelson to stop and she did not appreciate his conduct and that Plaintiff would walk away to distance herself from him)).

The evidence submitted by Plaintiff creates a factual issue as to whether Nelson committed battery by intentionally touching Plaintiff in a harmful or offensive manner. Accordingly, Nelson's motion for summary judgment as to these counts is due to be denied.

    2. <u>Privacy – Count Seven</u>

To succeed on a claim for invasion of privacy related to sexual harassment, a plaintiff must show that (1) the matters intruded into are of a private nature and (2) the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation. *Atmore*, 719 So. 2d at 1191 (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 323 (Ala. 1989)). Such an invasion of privacy may occur by way of

physical intrusion into the plaintiff's space or by invasion of one's "emotional sanctum," and the law prohibits wrongful intrusion into either area of recognized privacy protection. *Phillips v. Smalley Maintenance Servs.*, 435 So. 2d 705, 709 (Ala. 1983). "While asking a co-employee for a date and making sexual propositions usually do not constitute an invasion of privacy, extensive inquiries into one's sex life … may constitute an invasion of privacy." *Atmore*, 719 So. 2d at 1191.

Nelson contends Plaintiff's invasion of privacy claim fails because she has offered no evidence that Nelson's conduct was "so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." (Doc. 27 at 17) (citing *Kelley v. Worley*, 29 F. Supp. 2d 1304, 1311 (M.D. Ala. 1998)). In *Kelley*, the court denied summary judgment where the plaintiff submitted evidence that the defendant made one lewd comment and several unwanted touchings by placing his hands under the plaintiff's skirt. 29 F. Supp. 2d at 1311.

Nelson made several lewd comments to Plaintiff. Some were directed at her without reference to her private sex life but were suggestive or propositioning. (Doc. 4 at ¶ 15). Others were explicit and offensive comments about Plaintiff's relationship with her husband. (*See, e.g.,* Doc. 4 at ¶ 39-46) ("If I was Jonathan, I'd grab you by the hair and f\*\*k the s\*\*t out of you;" "If I was Jonathan, I'd be banging the s\*\*t out of it."). A jury could find these comments constitute intrusions into Plaintiff's private life or invasions of Plaintiff's "emotional sanctum." *Phillips*, 435 So. 2d at 709. Further, Plaintiff has presented evidence Nelson made lewd gestures and touched her on her waist and lower back right above her buttocks. Taken together, the evidence creates a factual issue whether Nelson's conduct constituted an invasion of Plaintiff's privacy. Accordingly, Nelson's motion for summary judgment is due to be denied as to Count Seven.

      3.  <u>Outrage – Count Eight</u>

Under Alabama law, the tort of outrage is an "extremely limited cause of action" that is recognized with regard to only three kinds of conduct: wrongful conduct regarding burial matters; barbaric methods used to coerce an insurance settlement; and egregious sexual harassment. *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). The plaintiff must show that: (1) the defendant intended to inflict extreme emotional distress; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff's distress; and (4) the distress was severe. *O'Rear v. B.H.*, 69 So. 3d 106, 119 (Ala. 2011) (finding outrage where physician traded opiates to a teenage patient for sex and continued the relationship once patient became addicted); *see also Hill v. Cundiff*, 797 F.3d 948, 985-86 (11th Cir. 2015) (reversing grant of summary judgment as to claim of outrage where school administrator used one student as "bait" in a plan to catch another sexually predatory student and the victim was raped during the course of the plan's execution); *cf. Stancombe*, 652 Fed. App'x at 739 (affirming grant of summary judgment in favor of defendant where defendant made vulgar, sexual gestures).

Plaintiff has submitted evidence which, if true, shows reprehensible conduct on Nelson's part. However, while there is evidence Nelson was aware his advances and contact with Plaintiff were unwanted, there is no evidence before the court that it was Nelson's intent to inflict "extreme emotional distress." Further, although there is evidence of lewd and offensive conduct, it is not on par with the acts at issue in cases where the tort of outrage has been applied above and beyond more conventional causes of action such as battery or intentional infliction of emotional distress. Given the limited nature of the tort of outrage and the extreme intent, conduct, and effect required for liability, the court finds the evidence submitted is insufficient to create a factual issue as to this claim. Accordingly, Nelson's motion for summary judgment is due to be granted as to Count Eight.

## IV.	CONCLUSION

For the foregoing reasons, Plaintiff has shown a genuine factual issue as to Counts Three through Seven.  Plaintiff concedes there is no genuine issue as to Counts One and Two, and Plaintiff has failed to create a genuine factual issue as to Count Eight.  As to all other claims, the court finds there are genuine disputes as to issues of material fact, and thus, judgment cannot be granted as a matter of law.  Accordingly, the motion for summary judgment filed by Milo's (Doc. 23) is **GRANTED** as to Counts One and Two, and it is **DENIED** as to Counts Three and Four.  The motion for summary judgment filed by Nelson (Doc. 26) is **DENIED** as to Counts Five, Six, and Seven, and it is **GRANTED** as to Count Eight.

**DONE** and **ORDERED** this 27th day of July, 2017.

_____
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE